IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CT-3016-FL

| | | |
|---|---|---|
| KELCEY ROSWELL THORPE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MARCUS BARROW, J.M. GWINN, | ) | |
| D.A. ELLIOTT, and JEFFREY | ) | |
| MACIALEK, | ) | |
| | ) | |
| Defendants.[1] | ) | |

NO. 5:15-CV-511-FL

| | | |
|---|---|---|
| KELCEY ROSWELL THORPE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| MARCUS BARROW, J.M. GWINN, | ) | |
| JEFFREY MACIALEK, and D.A. | ) | |
| ELLIOTT, | ) | |
| | ) | |
| Defendants.[1] | ) | |

The matter is before the court on defendants' second motion for summary judgment (DE 70)

pursuant to Federal Rule of Civil Procedure 56, and plaintiff's motion for trial and subpoena (DE

87). The motion for summary judgment has been fully briefed and defendants did not respond to

---

[1] The court has constructively amended the caption of this order to reflect dismissal of formerly-named defendants John Doe Police Officers, Melissa D. Pelfrey, Michael Waters, and E. N. Bagshawe, and the correct spelling of defendant Gwinn's name. (See Dec. 7, 2016 Order (DE 54) at 4; Defs.' Part. Mot. Dismiss (DE 56) at 1; Defs.' Summ. J. Br. (DE 73) at 1). The Clerk of Court is DIRECTED to change defendant "Sergeant Gwynn" to "J. M. Gwinn" on the docket.

the motion for trial and subpoena. In this posture, the issues raised are ripe for adjudication.

## STATEMENT OF THE CASE

On January 15, 2015, plaintiff, a state inmate, filed Thorpe v. Barrow, No. 5:15-CT-3016-FL (E.D.N.C. Jan. 15, 2015) ("Thorpe I"), pro se, pursuant to 42 U.S.C. § 1983, alleging that he was subject to an illegal arrest and incarceration, and that defendants used excessive force against him after he was detained. On July 22, 2015, the court conducted a frivolity review pursuant to 28 U.S.C. § 1915, and the court determined that plaintiff's illegal arrest and incarceration claim was barred by Heck v. Humphrey, 512 U.S. 477, 486-87 (1994) (holding that a state prisoner may not maintain a § 1983 action for damages for an allegedly unconstitutional conviction without first showing his conviction or sentence has been reversed, expunged, declared invalid, or otherwise called into question).[2] The court allowed plaintiff's excessive force claim against defendants J.M. Gwinn, D.A. Elliot, and Jeffrey Macialek to proceed, and dismissed the remaining defendants.

On September 29, 2015, plaintiff, filed Thorpe v. Barrow, No. 5:15-CV-511-FL (E.D.N.C. Sept. 29, 2015) ("Thorpe II"), pro se,[3] alleging substantially the same claims as those alleged in Thorpe I, against virtually identical parties. On November 15, 2016, the court consolidated Thorpe I and Thorpe II, directing that "all future docket entries shall be docketed in the lead case – Thorpe I." (Nov. 15, 2016 Order (DE 52) at 7). The court also granted plaintiff's Federal Rule of Civil Procedure 59(e) motion, reinstating plaintiff's unlawful arrest claims because his underlying state court convictions had been vacated and those claims were no longer barred under Heck. (See id.

---

[2] After this court conducted its initial frivolity review, plaintiff's conviction in the underlying state prosecution was vacated by the Superior Court of Vance County, North Carolina because "the grand jury did not find a true bill on the bills of indictment." (See Sept. 30, 2010 Judgment/Order (DE 83-2) at 1).

[3] Plaintiff had been released from custody when he filed Thorpe II. (See Sept. 10, 2015 Judgment/Order (DE 83-2) at 1).

at 5). Plaintiff was directed to file a particularized amended complaint and "specifically name each defendant he seeks to sue and to clearly set forth each of his claims against such defendants in one single complaint." (Id. at 6). Plaintiff was further notified "that his amended complaint will be considered his complaint in its [entirety], and the court will not review plaintiff's other filings to glean any misplaced claims." (Id.). The court denied defendants' then-pending first motion for summary judgment in Thorpe I as moot in light of the court's ruling directing plaintiff to file an amended complaint.

On November 29, 2016, plaintiff filed as directed an amended complaint. On December 7, 2016, the court conducted a frivolity review of plaintiff's amended complaint pursuant to 28 U.S.C. § 1915. Former defendant E. N. Bagshawe, the attorney who represented plaintiff during his state criminal proceedings, was dismissed without prejudice because plaintiff failed to allege facts tending to establish that he was a state actor. The court also dismissed without prejudice former defendants Michael Waters and Melissa D. Pelfrey, the state prosecutors involved with plaintiff's state criminal proceedings, because plaintiff's claims against them were barred by the doctrine of prosecutorial immunity. Plaintiff's claims against former defendant John Doe Police Officers were also dismissed without prejudice. The court allowed plaintiff to proceed with his excessive force and false arrest/false imprisonment claims against Marcus Barrow, the chief of the City of Henderson Police Department, and Henderson police officers J.M. Gwinn, D.A. Elliott, and Jeffrey Macialek.

On August 15, 2017, the court granted in part and denied in part defendants' motion to dismiss. The court dismissed plaintiff's claims to the extent they could be construed to allege any state law claims, and denied the motion insofar as it sought dismissal of plaintiff's § 1983 claims. Thereafter, the court entered an amended scheduling order, which established a discovery deadline

of September 18, 2017, and a dispositive motion deadline of October 18, 2017.

Defendants filed the instant motion for summary judgment (DE 70) on October 18, 2017. In their motion, defendants argue that they are entitled to summary judgment for the following reasons: (1) plaintiff's false arrest/false imprisonment claim lacks merit because defendants had probable cause to arrest plaintiff; (2) defendants are entitled to qualified immunity on plaintiff's excessive force claims; and (3) there is no record evidence establishing any cognizable §1983 claim against defendant Barrow. In support of the motion, defendants rely upon a statement of material facts and an appendix which includes personal affidavits from defendants Gwinn, Elliot and Macialek, an affidavit from witness Jonathan Thomas, and excerpts from the transcripts of plaintiff's depositions. Plaintiff responded to the motion on January 12, 2018, and relies upon as part of his response various state court records from the underlying state criminal proceedings and medical records indicating plaintiff uses a Continuous Positive Airway Pressure ("CPAP") machine when sleeping.

On February 14, 2018, plaintiff filed the instant motion for trial and subpoena (DE 87), requesting that his "claim . . . be heard in a federal court setting" and also that the court issue various subpoenas on his behalf. Defendants did not respond to that motion.

## STATEMENT OF THE FACTS

Except where otherwise noted by the court, the undisputed facts are as follows. On May 1, 2014, the Henderson Police Department received a report about a suspicious person, described as a black male wearing a white shirt, walking in the Wendover Drive area of Henderson, NC at approximately 2:49 a.m. (Thomas Aff. (DE 72-1) ¶ 3). Officer Jonathan Thomas and defendant D.A. Elliot responded to the call. When he arrived at the scene, officer Thomas observed plaintiff

4

in a white t-shirt walking in someone's yard.[4] (Id. ¶ 4). When plaintiff observed the officers, he ran from them. (Pl.'s First Dep. (DE 72-3) at 52:20-21). Plaintiff testified that, "I ran up through, I think some houses, some subdivision." (Pl.'s Second Dep. (DE 72-7) at 20:12-13). Plaintiff also admitted that he was walking in the Wendover Drive area that night and wearing a "bright, brand new, sparkling white, won't a dot on it, Nike shirt." (See Pl.'s First Dep. (DE 72-3) at 52:13-15).

Officers then commenced a search of the area for plaintiff. As defendant Elliot was searching, a resident came outside and informed Elliot that he had just seen a black male wearing a white t-shirt run down a hill on his property, headed across a creek bed towards a wooded area. (Elliot Aff. (DE 72-2) ¶ 7). Defendant Elliot went down to the creek area to search for plaintiff. (Id. ¶ 8). As he was walking to the creek bed, he found a black global position system ("GPS") unit and a pack of batteries on the ground. (Id. ¶ 11). The GPS unit and batteries appeared to be dry, even though it had been raining that night. (Id. ¶¶ 11-12).

Defendant Elliot reported over radio that he had found a GPS unit and batteries that appeared recently dropped on the ground. (Elliot Aff. (DE 72-2) ¶ 12; Gwinn Aff. (DE 72-4) ¶ 3). Defendant Gwinn, who had arrived on the scene, asked defendant Macialek to bring the canine unit to assist in the search for plaintiff. (Gwinn Aff. (DE 72-4) ¶¶ 3-4).

The canine tracked plaintiff through the yards of several private residences, and began circling a blue Ford truck parked in a backyard. (Id. ¶ 5). Defendants discovered plaintiff lying down in the front seat of the truck. (Id. ¶ 6). Plaintiff testified that he entered what he believed to be an abandoned car because he was scared of the canine. (Pl.'s First Dep. (DE 72-3) at 53:4-20). Plaintiff also admitted that he did not have the owner's permission to enter the vehicle. (Pl.'s

---

[4]Plaintiff contends that he was walking in the grass on the side of the road. (Defs' Br. (DE 73) at 3).

Second Dep. (DE 72-7) at 26:2-9). Defendants Gwinn, Elliot, and Macialek observed plaintiff sweating profusely and short of breath, and that he had red dirt on his shirt and on the left side of his head. (Gwinn Aff. (DE 72-4) ¶ 6; Elliot Aff. (DE 72-2) ¶¶ 17-18; Macialek Aff. (DE 72-5) ¶ 12).

Defendant Elliot drew his duty weapon and ordered plaintiff to get out of the vehicle. (Elliot Aff. (DE 72-2) ¶ 16). Plaintiff got out of the vehicle and was placed in handcuffs, which he alleges were "very tight." (Elliot Aff. (DE 72-2) ¶ 16; Macialek Aff. (DE 72-5) ¶ 11; Am. Compl. (DE 53) at 3). Officer Thomas transported plaintiff to the Henderson Police Department. (Thomas Aff. (DE 72-1) ¶ 15).

While plaintiff was in transit, defendants Elliot and Macialek stayed at the scene to collect evidence. (Elliot Aff. (DE 72-2) ¶ 21; Macialek Aff. (DE 72-5) ¶ 16). Defendant Elliot interviewed the resident who owned the vehicle plaintiff was found in, and the resident confirmed he did not know plaintiff and did not give him permission to enter the vehicle. (Elliot Aff. (DE 72-2) ¶ 22). Defendant Elliot then used the "home button" to locate the owner of the GPS unit he found while searching for plaintiff. (Id. ¶ 24). Elliot located the owner, who confirmed that the GPS unit belonged to her and that it had been taken from her vehicle that night. (Id. ¶ 26). Defendant Macialek also located another vehicle in the area which had a shattered window, and the owner of that vehicle stated that some change had been stolen from inside the vehicle. (Macialek Aff. (DE 72-5) ¶ 17).

When they arrived at the Henderson Police Department, officer Thomas placed plaintiff in an interview room. (Thomas Aff. (DE 72-1) ¶ 16). The parties dispute what occurred next. According to officer Thomas, plaintiff became hostile and started yelling and cursing at him. (Thomas Aff. (DE 72-1) ¶ 16). Although plaintiff testified at times that he "didn't give [the officers]

no hard time" he also admitted that he was "kicking the door" of the interview room after he was told to calm down. (Pl.'s First Dep. (DE 72-3) at 58:2-3, 58:23-25, 67:7-8). Officer Thomas determined that he could not remove the handcuffs due to plaintiff's agitated state and because plaintiff was substantially larger than Thomas. (Thomas Aff. (DE 72-1) ¶ 17). Officer Thomas was also aware of another individual who had recently escaped from the interview room, and he was concerned, based on plaintiff's prior flight from police and his obstreperous behavior, that plaintiff might also attempt to escape. (See id.).

When defendant Gwinn arrived at the station, officer Thomas requested that Gwinn assist with removing plaintiff's handcuffs so he could use the restroom. (Thomas Aff. (DE 72-1) ¶ 18; Gwinn Aff. (DE 72-4) ¶ 11). Defendant Gwinn entered the interview room, and told plaintiff he would be allowed to use the restroom if he calmed down. (Gwinn Aff. (DE 72-4) ¶ 14). Sergeant Gwinn then removed the handcuffs and escorted plaintiff to the restroom. (Id.; Pl.'s First Dep. (DE 72-3) at 58:13-15)). Plaintiff testified that after he finished using the restroom, he walked out and "[defendant Gwinn] ain't said nothing to me. [Defendant Gwinn] standing there, right there, and [the interview room is] where you took me in the beginning. I guess that's where you want me to be at. I know you didn't want me to stay in the bathroom." (Pl.'s First Dep. (DE 72-3) at 67:13-17). Plaintiff also testified that after he used the restroom, "I go back in my cell, bent down, picking up my change that fell out of my cargo pocket from when I was kicking the door." (Id. at 58:23-25).

According to defendant Gwinn, after plaintiff left the restroom, he ignored numerous orders to place his hands behind his back so officers could put the handcuffs on him again. (Gwinn Aff. (DE 72-4) ¶¶ 17-20). Instead, plaintiff walked back to the interview room unrestrained. (See id.; Thomas Aff. (DE 72-1) ¶ 24). Defendant Gwinn followed him into the interview room and again

instructed him to place his hands behind his back so he could be handcuffed. (Thomas Aff. (DE 72-1) ¶ 25; Gwinn Aff. (DE 72-4) ¶ 18). Plaintiff refused to comply, and instead reached his hands into his pockets, pulled out a large handful of change, and dropped it on the floor. (Thomas Aff. (DE 72-1) ¶ 27; Gwinn Aff. (DE 72-4) ¶ 20). Plaintiff then bent over and began slowly picking the change up off the floor. (Thomas Aff. (DE 72-1) ¶ 27; Gwinn Aff. (DE 72-4) ¶¶ 20-21). Defendant Gwinn stated he would pick the change up for him, and again instructed him to stand up and place his hands behind his back, but plaintiff refused to comply. (Thomas Aff. (DE 72-1) ¶ 29; Gwinn Aff. (DE 72-4) ¶ 22).

Defendant Gwinn was aware that another person had recently escaped from custody in that same interview room, and he was concerned that plaintiff could overpower both him and officer Thomas if he attempted to escape. (Gwinn Aff. (DE 72-4) ¶¶ 23-24). Defendant Gwinn removed his Aerosol Defense Spray ("ADC spray" or "pepper spray") and instructed plaintiff to stand up and place his hands behind his back or he would use the spray. (Thomas Aff. (DE 72-1) ¶ 30; Gwinn Aff. (DE 72-4) ¶ 28). Plaintiff stood up, and officer Thomas attempted to grab his hands to place them in handcuffs, but plaintiff pulled his hands away. (Thomas Aff. (DE 72-1) ¶ 31; Gwinn Aff. (DE 72-4) ¶ 29). At this point, Gwinn instructed officer Thomas to move away and deployed the ADC spray for three to five seconds. (Thomas Aff. (DE 72-1) ¶ 31; Gwinn Aff. (DE 72-4) ¶ 29). After the spray was deployed, plaintiff continued to refuse the officers' requests to place his hands behind his back, and attempted to leave the interview room. (Thomas Aff. (DE 72-1) ¶¶ 32-33; Gwinn Aff. (DE 72-4) ¶¶ 30-31). Defendant Gwinn and officer Thomas stopped him, however, and were able place the handcuffs on him. (Thomas Aff. (DE 72-1) ¶¶ 32-33; Gwinn Aff. (DE 72-4) ¶¶ 30-31).

Plaintiff's version of these events (which the court accepts as true for present purposes) is somewhat different. Plaintiff confirms that he was not in handcuffs when he walked out of the restroom, that he entered the interview room (unrestrained) to pick up change that had fallen out of his pockets, and that he was not in handcuffs when defendant Gwinn deployed the ADC spray. (Pl.'s First Dep. (DE 72-3) at 58:18-59:8). Plaintiff denies, however, that the officers instructed him to place his hands behind his back so he could be handcuffed before defendant Gwinn deployed the ADC spray. (Id. at 67:18-25). Plaintiff testified, for example, as follows:

> But I ain't got the cuffs on me now. I go back in my cell [after leaving the restroom], bent down, picking up my change that fell out of my cargo pocket from when I was kicking the door. He come up behind me (gesturing) with the mace. I'm like this. He macing me straight in my face while I'm picking up my change. [Defendant Gwinn said,] "Turn around. Put your hands behind your back." I'm like, "Oh, man. What you macing me for? I got my back to you." Bent down, I'm not bothering you.
> . . .
>
> Q: He said, "Put your hands behind your back"?
> A: After he maced me.
> Q: After he maced you?
> A: Yes, sir. And my back is to him. I'm bending down, picking up change.
> Q: All right.
> A: No threat to him whatsoever.

(Id. at 58:21-59:8, 67:18-25). Plaintiff also testified that the officers "use[d] about the whole can" of ADC spray on him. (Id. at 59:4-12).

Henderson Police Department policy dictates that officers must take individuals who have been sprayed with ADC spray outside to be exposed to fresh air and provided water as soon as it is safe to do so. (Gwinn Aff. (DE 72-4) Ex. B at 4). The officers informed plaintiff that they intended to take him outside, but plaintiff initially refused. (Thomas Aff. (DE 72-1) ¶ 35; Gwinn Aff. (DE 72-4) ¶ 33). Defendant Gwinn and officer Thomas eventually gained control of plaintiff and escorted him outside. (Thomas Aff. (DE 72-1) ¶ 35; Gwinn Aff. (DE 72-4) ¶ 33). Defendant Gwinn also

offered plaintiff some cool water to help wash off the ADC spray, but plaintiff refused. (Gwinn Aff. (DE 72-4) ¶ 34). At that point, defendant Macialek arrived and assumed responsibility for watching plaintiff while he recovered. (Thomas Aff. (DE 72-1) ¶ 37; Macialek Aff. (DE 72-5) ¶ 20). Defendant Elliot also had returned to the police station, and was in his patrol car preparing warrants, with a full view of plaintiff and Macialek. (Elliot Aff. (DE 72-2) ¶¶ 29-30).

According to defendant Macialek, plaintiff began rocking back and forth, which suggested he was preparing to stand up. (Macialek Aff. (DE 72-5) ¶ 21). Defendant Macialek considered plaintiff a flight risk because plaintiff was outside and previously had run from the officers, and so he instructed plaintiff to remain seated. (Macialek Aff. (DE 72-5) ¶¶ 23-24). Plaintiff stated that he was going to "stand the f*** up." (Macialek Aff. (DE 72-5) ¶ 22; Elliot Aff. (DE 72-2) ¶ 32). Defendant Macialek again instructed plaintiff to remain seated and warned him that he would be sprayed with pepper spray again if he refused to comply. (Macialek Aff. (DE 72-5) ¶ 25; Elliot Aff. (DE 72-2) ¶ 32). Plaintiff then stood up, but defendant Macialek was able to grab plaintiff's handcuffs and pull backwards, causing plaintiff to sit back down. (Macialek Aff. (DE 72-5) ¶ 26; Elliot Aff. (DE 72-2) ¶ 33).

Plaintiff then stood up again and stated that he was not going to sit down. (Macialek Aff. (DE 72-5) ¶ 27; Elliot Aff. (DE 72-2) ¶ 34). Defendant Macialek attempted to grab plaintiff's handcuffs again, but plaintiff pulled away and put his back against a brick wall so that Macialek could not reach plaintiff's handcuffs. (Macialek Aff. (DE 72-5) ¶¶ 28-29; Elliot Aff. (DE 72-2) ¶ 34). Defendant Macialek then deployed his ADC spray on plaintiff for three to five seconds. (Macialek Aff. (DE 72-5) ¶ 30; Elliot Aff. (DE 72-2) ¶ 35).

Plaintiff recounts the second ADC spray incident as follows:

"So I stood up to try to catch my air. Because I'm talking about I'm sitting down like this. I can't hardly breathe. Pants down here. So I get up, like this. I'm reaching between the loop, trying to pull my shorts up. And I can't see because I'm blind. Man, I'm like (gesturing). And I heard the officer say, "Sit down." (Gesturing.) Now, I was handcuffed to the back. [The officer said,] "Sit down, start – sit down." He macing me dead in my face, point-blank range. Another officer come up: "He told you to sit down," and he shoved me. I fell back. Got the scar on my back to prove it. I fell down on the step. And I can show you the scar if you want to see it.
...

I get up to pull my – and standing up, I can breathe better than sitting down. Because I'm crouched down. I'm handcuffed. If I stand up, I can open my passages. That's what I wanted to do. . . . I can't breathe. Then he maced me the second time.
...

Q: Could you hear what they were saying to you?
A: I heard them tell me to sit down.
Q: Okay.
A: While he walking towards me, macing me.

(Pl.'s First Dep. (DE 72-3) at 60:13-61:5; 76:3-17).

In his amended complaint, plaintiff alleges that defendants deployed the ADC spray "continuously" while he was fully restrained during both incidents. (See DE 53 at 4-5). As to the second spraying incident, plaintiff alleges that defendant Macialek "started macing me in the face again because I stood up" and defendant Elliot (not Macialek) shoved him to the ground. (See id. at 4).

After defendant Macialek deployed the spray, plaintiff sat down and became cooperative. (Macialek Aff. (DE 72-5) ¶ 36; Elliot Aff. (DE 72-2) ¶ 35). He accepted cool water and tissues to wash off the spray. (Macialek Aff. (DE 72-5) ¶ 39; Elliot Aff. (DE 72-2) ¶ 36).

Plaintiff was later transported to the Vance County Jail, where he was formally charged with breaking or entering a motor vehicle, resisting a public officer, and larceny. (See Macialek Aff. (DE 72-5) ¶ 38; Elliot Aff. (DE 72-2) ¶ 37; Order for Joinder (DE 83-3) at 37). Plaintiff proceeded to

trial in the Vance County Superior Court and was convicted of breaking and entering (two counts) and larceny. (Verdict (DE 83-3) at 31-32). The trial judge, however, subsequently vacated his convictions because "the grand jury did not find a true bill on the bills of indictment" and ordered plaintiff immediately released from custody. (Sept. 10, 2015 Judgment/Order (DE 83-2) at 1).

Plaintiff alleges that as a result of the ADC spraying incidents, he is "still having serious complications with my breathing" and he has to "sleep on a C-PAP breathing machine the rest of my life." (Am. Compl. (DE 53) at 7). Plaintiff also alleges that as a result of his unlawful arrest, he spent two years in prison for a crime he did not commit. (See id.).

## DISCUSSION

A. Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading" but "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248-49; see also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party thus "bears the burden of showing, by means of affidavits or other verified evidence, that [a] genuine dispute of material fact exists." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477

U.S. at 250.

B.     Analysis

Defendants assert the affirmative defense of qualified immunity.  Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct.  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  Pearson, 555 U.S. at 236.  If the plaintiff cannot establish a violation of a constitutional right, defendants are entitled to qualified immunity and it is not necessary to undertake the clearly established analysis.  See id. Thus, the court first examines whether defendants violated plaintiff's constitutional rights.

a.     False Arrest/False Imprisonment Claim

Plaintiff's first claim is that defendants violated his Fourth Amendment right be free from unlawful arrest or seizure.  In support of this claim, plaintiff relies upon the fact that the state trial judge vacated his convictions because the grand jury failed to return a true bill of indictment, and plaintiff contends he was thus arrested, tried and convicted of a crime he did not commit.

An "arrest is a seizure of the person, and . . . the general rule is that 'Fourth Amendment seizures are 'reasonable' only if based on probable cause.'" Rogers v. Pendelton, 249 F.3d 279, 290 (4th Cir. 2001) (quoting Dunaway v. New York, 442 U.S. 200, 213 (1979)).  Thus, to establish a

Fourth Amendment claim based on unlawful arrest or false imprisonment, plaintiff must show the arrest was not supported by probable cause. Miller v. Prince George's Cnty., Md., 475 F.3d 621, 627 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 607 (E.D.N.C. 2009). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002).

In North Carolina, the elements of breaking or entering a motor vehicle include: (1) there was a breaking or entering by the defendant; (2) without consent; (3) into a motor vehicle; (4) containing goods, wares, freight, or anything of value; and (5) with the intent to commit a felony or larceny therein. See N.C. Gen. Stat. § 14-56(a). The first element can be satisfied with evidence of either breaking or entering. Id.; see State v. Myrick, 306 N.C. 110, 114 (1982).

Plaintiff's arrest for breaking or entering into motor vehicles was supported by ample probable cause. As defendants summarize, the evidence supporting probable cause in this case included, inter alia, the following:

1) the report of a suspicious person in the area matching plaintiff's description (Thomas Aff. (DE 72-1) ¶ 3);

2) plaintiff's flight through the neighborhood when he was approached by police (Pl.'s First Dep. (DE 72-3) at 52:20-21);

3) the dry GPS unit (despite the earlier rain that day) found on the ground where plaintiff had been running, and the subsequent confirmation that the GPS unit had been taken from a nearby vehicle (Elliot Aff. (DE 72-2) ¶¶ 11-12, 24, 26);

4) the fact that plaintiff was found hiding in a vehicle in a yard he had been running through

and that plaintiff admitted he did not have the owner's permission to enter the vehicle (Gwinn Aff. (DE 72-4) ¶ 6; Pl.'s Second Dep. (DE 72-7) at 26:2-22); and

5) the fact that another nearby vehicle had been broken into and change had been stolen, and that plaintiff was later found to have change in his pocket at the police department (Macialek Aff. (DE 72-5) ¶ 17).

(See Defs.' Summ. J. Br. (DE 73) at 18).

Thus, before plaintiff was taken into custody, defendant Elliot found a dry GPS unit (a common item of value found in vehicles) on the ground in the path plaintiff had been running. The fact that the GPS unit was dry despite the recent rain and that it was found in the path plaintiff was running reasonably suggests plaintiff dropped it during his flight from police. And the fact plaintiff dropped the GPS unit while running from police suggests that it was illegal contraband plaintiff was trying to conceal from the officers. Moreover, plaintiff admitted that he entered the vehicle he was found in without the owner's permission, which suggests he may have entered other vehicles that night without permission.[5] (Pl.'s Second Dep. (DE 72-7) at 26:2-6). In light of plaintiff's admission that he entered a vehicle without permission, that the GPS unit is a common item of value found in vehicles, and that plaintiff dropped the GPS unit while running from police, under the totality of the circumstances, the officers had probable cause to arrest plaintiff for breaking or entering a motor vehicle.[6]   See Brown, 278 F.3d at 367 (holding probable cause exists where reasonable officer,

---

[5]Plaintiff testified that he entered the vehicle he was found in because he was running from police. (Pl.'s Second Dep. (DE 72-7) at 26:2-6). That testimony suggests the "intent to commit a felony or larceny therein" element of breaking and entering is lacking as to plaintiff's entry into that particular vehicle, but not other vehicles. See N.C. Gen. Stat. § 14-56(a).

[6]The defendants' post-arrest investigation also confirmed that the GPS unit had been taken out of a nearby resident's vehicle. Defendants also determined that another car had been broken into that night, and change had been stolen from that vehicle. Change was later found in plaintiff's possession at the police department.

considering the totality of the evidence available, would believe an offense has been or is being committed).

Plaintiff does not contest any of the facts supporting probable in his response, nor has the court found any admissible evidence in plaintiff's submissions that would create a genuine issue of material fact on the issue. See Bouchat, 346 F.3d at 522. As plaintiff notes, his convictions were ultimately vacated because the grand jury failed to return a true bill of indictment. But the reversal of a conviction standing alone does not imply the arrest was unsupported by probable cause. See Porterfield v. Lott, 156 F.3d 563, 570 (4th Cir. 1988) (concluding probable cause existed for an arrest despite the fact the conviction was reversed on appeal and noting "qualified immunity jurisprudence, as well as common sense, forbids us from charging the sheriff's deputies with the foresight to anticipate that even though the prosecutor, the judge, and the jury would all agree with them that [the defendant] had attempted to launder money, the South Carolina Court of Appeals would reverse this decision" as "a matter of technical statutory construction"). Plaintiff's arrest was supported by probable cause, and the fact that his convictions were later vacated does not change that finding.

Defendants are entitled to qualified immunity on plaintiff's false arrest and false imprisonment claim because the undisputed evidence establishes they had probable cause to arrest plaintiff and, accordingly, plaintiff cannot establish that defendants violated his Fourth Amendment right to be free from an unlawful seizure.

b.     Excessive Force

Plaintiff was an arrestee at the time of the alleged excessive force because his arrest had been completed when the incidents occurred. See Robles v. Prince George's Cnty., Md., 302 F.3d

16

262, 269 (4th Cir. 2002). While "[t]he Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person," the Fourth Amendment "does not extend to the alleged mistreatment of arrestees or pretrial detainees in custody." Riley v. Dorton, 115 F.3d 1159, 1161, 1164 (4th Cir. 1997) (citation omitted), abrogated on other grounds by, Wilkins v. Gaddy, 559 U.S. 34 (2010). Rather, "excessive force claims of pretrial detainees [and arresttees] are governed by the Due Process Clause of the Fourteenth Amendment." Id. at 1166.

To succeed on a claim of excessive force under the Due Process Clause of the Fourteenth Amendment, plaintiff must show that "the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015). The court "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. The court "must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal quotations omitted); see also Bell v. Wolfish, 441 U.S. 520, 540, 547 (1979).

When reviewing a claim for excessive force under the Fourteenth Amendment, the court should consider: (1) the relationship between the need for force and the amount used; (2) the extent of plaintiff's injury; (3) efforts made by the officers to limit or temper the amount of force used; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether plaintiff was actively resisting. Kingsley, 135 S. Ct. at 2473. These factors are not "exclusive" and the court "may identify other objective circumstances potentially relevant to a

determination of excessive force." E.W. by & through T.W. v. Dolgos, – F.3d –, 2018 WL 818303, at *4 (4th Cir. Feb. 12, 2018) (internal quotations omitted). The court must determine whether the force used was objectively reasonable "in full context, with an eye toward the proportionality of the force in light of all the circumstances [because] [a]rtificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015).

With these principles in mind, the court turns to whether, viewing the facts in the light most favorable to plaintiff, defendants' use of force was objectively reasonable. Plaintiff alleges that defendants used excessive force on three separate occasions: (1) when defendant Gwinn deployed ADC spray on him in the interview room; (2) when defendant Macialek deployed ADC spray on him when he was outside the police station; and (3) when defendant Elliot "shoved" him to the ground when he was outside the police station. (See Am. Compl. (DE 53) at 2-5).

According to plaintiff, the first ADC spray deployment occurred after he walked out of the restroom, returned to the interview room unrestrained, and began picking up change that had fallen out of his pocket when he was kicking the interview room door. (Pl.'s First Dep. (DE 72-3) at 58:21-59:8). Plaintiff testified that the officers did not instruct him to place his hands behind his back to be re-handcuffed after he left the restroom, or instruct him to return to the interview room. (Id. at 67:18-25). Plaintiff further testified that defendant Gwinn "come up behind me . . . with the mace. . . . [defendant Gwinn was] macing me straight in my face while I'm picking up my change." (Pl.'s First Dep. (DE 72-3) at 58:25-59:8). Plaintiff also admitted that he was kicking the interview room door prior to the incident. (Id at 58:2-3, 58:23-25). Defendant Gwinn stated in his affidavit that plaintiff was larger than him and officer Thomas, and he was concerned that plaintiff could

overpower them if he tried to escape. (Gwinn Aff. (DE 72-4) ¶ 23).

Based on the totality of the circumstances, defendant Gwinn's deployment of the ADC spray was not objectively unreasonable. Plaintiff had run from law enforcement earlier that night, he was kicking the door of the interview room just before he went to the restroom, and he left the restroom and walked back to the interview room unrestrained. Plaintiff then bent down to pick up change that had dropped from his own pocket while he was kicking the door. An objectively reasonable officer in those circumstances could have believed a weapon or other contraband was intermingled with the change on the floor, or that plaintiff was otherwise preparing an escape attempt by picking up the change and throwing it at the officers as a distraction when he ran.

Turning to the Kingsley factors, the need for force was apparent based on plaintiff's prior disruptive behavior, the fact that he was unrestrained,[7] and the fact that a weapon could have been concealed in the change plaintiff dropped on the floor (or the change itself could have been used as a weapon/diversion tactic). As to the amount of force used, plaintiff testified defendant Gwinn used "about the whole can" of ADC spray on him. But given that plaintiff was unrestrained, disruptive, and potentially reaching for a weapon, the relationship between the need for force and the amount used was not objectively unreasonable. See Grayson v. Peed, 195 F.3d 692, 696 (1999) (holding use of pepper spray was not excessive force where officers reasonably perceived inmate pos[ed] a danger to officers); Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996). For the same reasons, the severity of the security problem and the threat reasonably perceived by the officer weigh in favor of finding that defendant Gwinn's actions were objectively reasonable. See Kingsley, 135 S. Ct. at

---

[7]Plaintiff asserts in his response brief that he was fully restrained when defendant Gwinn deployed the pepper spray. But plaintiff cannot use his unsworn pleadings to contradict his sworn deposition testimony. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999). Thus, while the court views the facts in the light most favorable to plaintiff, it will only consider the version of events plaintiff recounted during his sworn deposition testimony.

2473.

As to the severity of the injury, plaintiff alleges that as a result of these incidents he is "still having serious complications with [his] breathing [and he has to use] a C-PAP breathing machine the rest of [his] life." (Am. Compl. (DE 53) at 7). Although plaintiff attached some medical records to his response to the motion for summary judgment, the records do not indicate that plaintiff's current health problems (including use of the CPAP machine) are related to the officers' deployment of the pepper spray. (See Pl.'s Resp. (DE 83-3) at 3-5). Thus, the court does not credit plaintiff's conclusory allegations that he suffered severe injury as a result of defendants deploying the ADC spray.[8] See Anderson, 477 U.S. at 248-49 (at summary judgment, nonmoving party "may not rest upon the mere allegations or denials of his pleading" but "must set forth specific facts showing that there is a genuine issue for trial.").

Based on the foregoing, the court concludes the first ADC spray deployment was an objectively reasonable use of force. Thus, defendant Gwinn is entitled to qualified immunity as to that incident because the undisputed evidence establishes that he did not commit a Fourteenth Amendment violation. See Pearson, 555 U.S. at 236.

The second ADC spray deployment occurred when plaintiff was in handcuffs outside the police station, where, pursuant to departmental policy, the officers had taken him to recover after the first ADC deployment. Defendants placed plaintiff on the ground outside the station and instructed him to remain seated because they considered plaintiff a flight risk. (Macialek Aff. (DE 72-5) ¶¶ 23-24). Plaintiff recounts that he "stood up to try to catch my air" and he "heard the officer

---

[8]Notably, plaintiff's amended complaint is not verified, and so the complaint cannot be considered an opposing affidavit for summary judgment purposes. See World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., 783 F.3d 507, 516 (4th Cir. 2015).

say, 'Sit down'" and then [defendant Macialek started] macing me dead in my face, point-blank range." (Pl.'s First Dep. (DE 72-3) at 60:13-25).

The court also concludes that the second ADC spray deployment was not objectively unreasonable. According to plaintiff's own version of events, he disobeyed a direct order to remain seated. (See id.). The need for force was obvious: plaintiff was outside the police station restrained only with handcuffs and thus easily could have escaped custody, he refused to remain seated, and he had attempted to escape from police earlier that same night. As to the amount of force used, plaintiff has not presented any evidence demonstrating how much ADC spray was deployed, so the court accepts defendant Macialek's affidavit testimony that he deployed the spray for 3 to 5 seconds. (Macialek Aff. (DE 72-5) ¶ 30; Elliot Aff. (DE 72-2) ¶ 35). Given plaintiff's refusal to obey an order to sit down and his prior attempt to escape custody, the relationship between the need for the use of force and the amount used was objectively reasonable. See Landman v. Peyton, 370 F.2d 135, 138 n.2 (4th Cir. 1966) (stating that mace can be constitutionally used to "prevent riots and escapes" or to control a "recalcitrant inmate").

The remaining Kingsley factors also weigh in favor of finding that the second ADC spray deployment was reasonable. As explained above, plaintiff has not produced any admissible evidence suggesting his current health problems are related to the ADC spray deployments, and there is no other evidence establishing he was significantly injured by them. Plaintiff's refusal to sit down posed a substantial security threat, given that he was outside and could have easily escaped (and that he had previously run from police that same night). And plaintiff has not disputed defendant Macialek's account that he only sprayed him for 3 to 5 seconds, which suggests Macialek attempted to "limit the amount of force." See Kingsley, 135 S. Ct. at 2473.

Based on the foregoing, the court concludes the second ADC spray deployment was an objectively reasonable use of force. Thus, defendant Macialek is entitled to qualified because the undisputed evidence establishes that he did not commit a Fourteenth Amendment violation. See Pearson, 555 U.S. at 236.

Finally, plaintiff testified that officer Elliot "shoved" him[9] to the ground during the second ADC spray deployment and he contends that this use of force was also excessive. (Pl.'s First Dep. (DE 72-3) at 61:1-5). As explained above, however, Plaintiff's refusal to sit down constituted a substantial security threat given that he was outside, disobeyed a direct order to sit down, was acting obstreperous, and previously had run from the officers. The amount of force used in these circumstances – pushing plaintiff to the ground – was reasonably related to the escape threat posed by plaintiff's refusal to remain seated.[10] See Saucier v. Katz, 533 U.S. 194, 209 (2001) (explaining a push or shove can be objectively reasonable when the surrounding circumstances "show some degree of urgency"). And the remaining Kingsley factors weigh in favor of defendant Elliot for the same reasons explained above in connection with the second ADC deployment.[11]

Based on the foregoing, the court concludes the shoving incident was an objectively reasonable use of force. Thus, defendant Elliot is entitled to qualified immunity because the

_____

[9]Defendant Elliot denies shoving plaintiff to the ground, but the court adopts plaintiff's version of events for purposes of ruling on defendants' motion.

[10]The court notes this is not a case where the officers assaulted a physically restrained, defenseless pretrial detainee. See Jones v. Buchannan, 325 F.3d 520, 534 (4th Cir. 2003) (denying qualified immunity where officer used "unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer") (emphasis added). As set forth above, plaintiff posed a significant threat to the officer in this case, despite being handcuffed.

[11]Plaintiff also alleges that he has a "serious scar" on his back and he was in a bandage fo three weeks as a result of the shoving incident. (See Am. Compl. (DE 53) at 4-5). But again plaintiff fails to present any admissible evidence establishing that he sustained a signficant injury after the shoving incident.

undisputed evidence establishes that he did not commit a Fourteenth Amendment violation.[12]  See Pearson, 555 U.S. at 236.

C.      Plaintiff's Claims Against Defendant Barrow

Plaintiff alleges defendant Barrow, the chief of the Henderson Police Department, failed to properly investigate his complaints about his arrest and the ADC spray incidents.  (See Am. Compl. (DE 53) at 5 (alleging defendant Barrow "lied to me and told me that he would handle the situation but never did.  In [two] years I did not hear from Marcus Barrow but twice.")).   Plaintiff has not, however, alleged or otherwise explained how the failure to investigate subordinate officers' actions is a cognizable § 1983 claim; nor is the court aware of any such claim.  As the court has explained, defendant Barrow cannot be held liable for the actions of other defendants under a *respondeat superior* theory.  See Wellington v. Daniels, 717 F.2d 932, 935 (4th Cir. 1983).  Finally, there is no record evidence suggesting defendant Barrow is liable under a supervisory liability theory.  See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).  Thus, the court grants defendants' motion for summary judgment as to any claims asserted against defendant Barrow.

C.      Plaintiff's Motion for Trial and Subpoena

Plaintiff has also filed a motion for trial and subpoena, wherein he requests that his claim "be heard in a federal court setting" and also that "all of the other law abiden [*sic*] citizens that I ask to have subpoena on my behalf be granted for more proof" and that "all my medical records be

---

[12]To the extent plaintiff also claims defendants violated the Fourteenth Amendment by placing the handcuffs on him too tightly, defendants are entitled to qualified immunity on that claim as well.  Plaintiff has pointed to no record evidence suggesting the handcuffing caused any significant injuries or otherwise was objectively unreasonable under the circumstances.  See, e.g., Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016) ("When there is no allegation of physical injury, the handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force under the Fourth Amendment."); Brown, 278 F.3d at 369 (noting "a standard procedure such as handcuffing would rarely constitute excessive force where the officers were justified . . . in effecting the underlying arrest.").

subpoena [*sic*] in court." (See Mot. (DE 87) at 1-2). The court construes this filing as a request that

the court issue subpoenas on plaintiff's behalf. As set forth in the governing scheduling order,

discovery closed on September 18, 2017. (Aug. 16, 2017, Order (DE 68) at 1). Plaintiff's motion

is untimely because he filed it on February, 14, 2018, long after discovery closed. See Naden v.

Saga Software, Inc., 11 F. App'x 381, 383 (4th Cir. 2001) (affirming district court's finding that a

motion to amend was untimely because it was filed four months after the scheduling order deadline

and after non-movant filed for summary judgment). Accordingly, the motion is DENIED.

## CONCLUSION

For the foregoing reasons, defendants' second motion for summary judgment (DE 70) is

GRANTED. Plaintiff's motion for trial and subpoena (DE 87) is DENIED. The Clerk of Court is

DIRECTED to close these consolidated cases (Nos. 5:15-CT-3016-FL; 5:15-CV-511-FL).

SO ORDERED, this the 20th day of March, 2018.


_____
LOUISE W. FLANAGAN
United States District Judge